IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

CODY FUGETT,

          Plaintiff,

vs.

DOUGLAS COUNTY, NEBRASKA, and
WELLPATH, LLC,

          Defendants.

**8:21–CV–125**

**MEMORANDUM AND ORDER ON
DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT**

      Plaintiff Cody Fugett alleged three distinct Counts in his Complaint against two different Defendants: Douglas County, Nebraska (Douglas County) and Wellpath, LLC (Wellpath). Filing 1-1. Count I is captioned "Negligence," Count II is captioned "Medical Malpractice, Medical Negligence," and Count III alleges a violation of the Eighth and/or Fourteenth Amendments pursuant to 42 U.S.C. § 1983. Filing 1-1 at 10–15. This Court concluded in a prior Order that Fugett could not go forward on Count I of his Complaint against Douglas County for lack of subject-matter jurisdiction. Filing 42 at 1. However, the Court's prior Order only pertained to Douglas County and did not dismiss Count I against Wellpath. *See generally* Filing 42.

      This matter comes before the Court on two related Motions for Summary Judgment. Douglas County has now moved for summary judgment on Counts II and III. Filing 82. Wellpath has also moved for summary judgment on all Counts. Filing 86. Fugett separately responded to both Motions. *See* Filing 90, Filing 92. For the following reasons, the Court dismisses Fugett's claim against Douglas County in Count II for lack of subject-matter jurisdiction and grants summary judgment in Douglas County's favor on Count III. The Court also grants summary judgment in Wellpath's favor on all Counts.

1

# I.  BACKGROUND

## A.  Factual Background

### 1.  *The Contract Between Douglas County and Wellpath*

Fugett's case arises out of the eight months he spent as an inmate at the Douglas County Corrections facility (DCC) in Omaha, Nebraska, from April 5, 2019, to December 4, 2019. Filing 1-1 at 4 (¶¶1–2); Filing 87-3 at 2 (¶6). Prior to this term of incarceration at DCC, Douglas County entered a contract with Wellpath "to provide comprehensive inmate health and mental health services to the persons in the custody of the Douglas County Department of Corrections ('DCDC')." Filing 84 at 2 (¶1); Filing 90 at 4 (¶1); Filing 87 at 5 (¶2); Filing 92 at 2. This contract was in effect at the time Fugett was at DCC. *See* Filing 32-2 at 15. It provided, in pertinent part,

> The Contractor [Wellpath] shall establish a comprehensive infection control program that includes monitoring and case management of inmates with infectious diseases such as HIV, TB, HCV, HBV, MRSA, and sexually transmitted infections such as gonorrhea, chlamydia, syphilis, and herpes. HIV counseling shall be consistent with the guidelines of the Centers for Disease Control (CDC) and state health department. An individual staff member shall be designated by the Contractor as responsible for the monitoring of infectious diseases and the reporting to the state health department as required. This individual shall be responsible to ensure that intake screening is carried out appropriately with questions relevant to infectious disease, which inmates are identified and treatment plans established, that inmates are followed through chronic/communicable disease clinics with consistent diagnostic testing and treatment consistent with community standards.

Filing 32-2 at 54–55.

> Routine diagnostic testing for sexually transmitted diseases is not generally available within the jail setting unless the individual exhibits signs and symptoms of a communicable disease. This information may be uncovered during the receiving or transfer screening, during medical examination or through the sick call process. Any individual identified with a sexually transmitted disease such as syphilis, gonorrhea, or chlamydia, shall be treated immediately to ensure treatment prior to release. Screening for HIV, Hepatitis B or Hepatitis C shall be based on symptom description rather than routine lab testing for these illnesses. Individuals who seek testing shall be tested. All HIV testing is on a volunteer basis unless court ordered. Contractor will comply with State of Nebraska reporting requirements.

Filing 32-2 at 71.

### 2. *Fugett's Health and Medical Treatment at DCC*

Fugett contracted syphilis and HIV sometime shortly before his term of incarceration at DCC began. Filing 1-1 at 4 (¶13); Filing 83-14 at 27. However, he "reported no prior exposure to or diagnosis of any sexually transmitted disease or infection . . . during his initial screening on April 4, 2019." Filing 87 at 6 (¶6); Filing 92 at 2. Within nine days of his arrival at DCC, Fugett submitted a written inmate request form (commonly referred to as a "kite") addressed to "Medical." Filing 87-3 at 2 (¶7); Filing 87 at 6 (¶6); Filing 92 at 2.[1] In this kite, Fugett stated (among other things) that he would "like to be tested for STDs." Filing 87 at 6 (¶11); Filing 87-3 at 2 (¶7); Filing 92 at 2; Filing 83-14 at 219. Medical staff submitted a written reply two days later on April 15, 2019, stating, "We do not do STD testing unless medically necessary. Do you have symptoms?" Filing 87 at 6 (¶11); Filing 87-13 at 2 (¶7); Filing 92 at 2; Filing 83-14 at 218. Fugett "did not submit a kite responding to the questions posed by medical staff." Filing 87 at 6 (¶11); Filing 87-3 at 2 (¶7); Filing 92 at 2.

The following day, April 16, 2019, "Fugett received a mental health assessment and reported no symptoms and no history of syphilis, gonorrhea, or HIV." Filing 87-3 at 2 (¶8); Filing 87 6 (¶12); Filing 92 at 2. Fugett also completed a syphilis questionnaire at this time and reported that he did not have HIV, he did not "have sex with men who have sex with men," he had not had a positive syphilis test in the past, and he had not recently experienced genital sores, blisters, ulcers

---

[1] According to the deposition of Mary Earley, a Certified Jail Manager and the Captain of Compliance for DCDC, when an inmate submits a kite, the inmate address it to the appropriate department for review, and "[o]nce the kite is delivered the recipient will respond to the [i]nmate on the same kite." Filing 83-3 at 3. DCC's kite system is separate and distinct from its inmate grievance system; "the former is used to request services [whereas] the latter is meant for filing complaints." Filing 83-3 at 3. Nothing "prohibits an [i]nmate from utilizing both systems at the same time." Filing 83-3 at 3.

lasting three to six weeks, or an unexplained rash on a large part of his body, hands, or feet. Filing 87 at 6–7 (¶12); Filing 87-3 at 2–3 (¶8); Filing 92 at 2; Filing 83-14 at 220.[2]

The next time Fugett made mention of any STD via a kite was over a month later on May 27, 2019. Filing 87 at 7 (¶13); Filing 87-3 at 3 (¶9); Filing 92 at 2; Filing 83-14 at 198. He wrote, "Have some possible STD or something sores on my penis please help." Filing 87 at 7 (¶13); Filing 87-3 at (¶9); Filing 92 at 2; Filing 83-14 at 198. This was the first time that Fugett had reported a potential symptom. Filing 87 at 7 (¶13); Filing 92 at 2. Fugett was seen and evaluated by a Licensed Practical Nurse (LPN) on June 3, 2019—exactly one week after he submitted the kite. Filing 87-3 at 3 (¶9); Filing 87 at 7 (¶13); Filing 92 at 2. During his June 3, 2019, appointment with the LPN, Fugett reported experiencing intermittent pain to his left testicle accompanied with a lump. Filing 87 at 7 (¶13); Filing 87-3 at 3 (¶9); Filing 92 at 2; Filing 87-7 at 2. The LPN obtained Fugett's vital signs, completed a physical examination, and noted that he had penile blisters. Filing 87 at 7 (¶13); Filing 87-3 at 3 (¶9); Filing 92 at 2; Filing 87-7 at 3. The LPN scheduled a follow-up appointment for Fugett to be seen by a medical doctor. Filing 87 at 7 (¶13); Filing 87-3 at (¶9); Filing 92 at 2.

Fugett was seen by Dr. Anthony Montegut the very next day, June 4, 2019. Filing 87 at 7 (¶14); Filing 87-3 at 3 (¶10); Filing 92 at 2. Dr. Montegut also took Fugett's vitals and completed a physical examination. Filing 87 at 7 (¶14); Filing 87-3 at 3 (¶9); Filing 92 at 2; Filing 87-8 at 3. During the examination, Dr. Montegut observed an "[e]rythematous based, vesicular rash across [the] tip and distal shaft of [Fugett's] penis." Filing 87-8 at 4; Filing 87 at 7 (¶14); Filing 87-3 at 3 (¶10); Filing 92 at 2. Dr. Montegut assessed Fugett as presumptively having genital herpes simplex

---

[2] When Fugett was asked about this syphilis questionnaire during his deposition on June 2, 2022, he said that he "really [did not] remember this." Filing 83-14 at 75. However, he went on to admit during his deposition that at least one of the answers he gave in response to this questionnaire was possibly inaccurate. *See* Filing 83-14 at 77–80.

virus (HSV), ordered a herpes antibody test, and prescribed Fugett an antiviral medication that is commonly used to treat recurrent HSV symptoms. Filing 87 at 7 (¶14); Filing 87-3 at 3 (¶10); Filing 92 at 2; Filing 87-8 at 4. Fugett's HSV-antibody test came back positive for both oral and genital herpes two days later on June 6, 2019. Filing 87 at 7 (¶15); Filing 87-3 at 3 (¶11); Filing 92 at 2; Filing 87-9 at 4.

On June 20, 2019, exactly two weeks after his HSV tests came back positive, Fugett was transferred to the University of Nebraska Medical Center (UNMC) after he reportedly tripped down a flight of stairs at DCC. Filing 87 at 7 (¶16); Filing 87-3 at 4 (¶12); Filing 92 at 2. "While at UNMC, he was seen and assessed by numerous providers and his bloodwork was evaluated." Filing 87-3 at 4 (¶12); Filing 87 at 7 (¶16); Filing 92 at 2. "Fugett made no requests for STD testing, and he reported no symptoms related to any potential STD when he was seen by providers at UNMC. Filing 87-3 at 4 (¶12); Filing 87 at 7–8 (¶16); Filing 92 at 2.

Three months went by with no complaints by Fugett related to any STD. Filing 87 at 8 (¶17); Filing 92 at 2. On or about September 25, 2019—nearly six months into his eight-month term of incarceration at DCC—Fugett submitted another kite addressed to "Medical" in which he noted that he had taken an HIV test prior to arriving at DCC and was "now" experiencing symptoms. Filing 87 at 8 (¶17); Filing 87-3 at 4 (¶13); Filing 92 at 2; Filing 87-10. On or about September 26, 2019, a provider responded to Fugett and asked "where to obtain Fugett's prior HIV records, what his symptoms were, where the testing occurred, and what medications he previously took." Filing 87-3 at 4 (¶13); Filing 87 at 8 (¶17); Filing 92 at 2; Filing 87-10.[3] Fugett "did not

---

[3] Wellpath and Fugett contend in their respective briefs that Fugett submitted this kite on September 26, 2019, and that the provider responded the "next day." Filing 87 at 8 (¶17); Filing 92 at 2. Amber Dynball—a registered nurse employed by Wellpath—reports the same in her affidavit. Filing 87-3 at 1 (¶3), 4 (¶13). However, the actual kite that Dynball cites to support this assertion in her affidavit suggests that Fugett submitted the kite a day earlier on September 25, 2019, with the provider responding on September 26, 2019. Filing 87-10. This slight discrepancy in dates is of no substantive consequence on these Motions.

submit a kite in response to the questions posed by medical staff." Filing 87 at 8 (¶17); Filing 87-3 at 4 (¶13); Filing 92 at 2.

On October 5, 2019, approximately 10 days after submitting that kite, Fugett had a visitor at DCC. Filing 87 at 8 (¶18); Filing 92 at 2; Filing 87-20. During their conversation, Fugett told his visitor, "I might be HIV positive . . . I'mma [sic] write a kite and say that my ex tested positive." Filing 87 at 8 (¶18); Filing 92 at 2; Filing 87-20 at 21:14–21:50. Fugett then said, "I'll just be like one of my ex-girlfriends tested positive for chlamydia or something." Filing 87 at 8 (¶18); Filing 92 at 2; Filing 87-20 at 21:50–21:54. Fugett then asked his visitor how long it would be before he noticed symptoms. Filing 87 at 8 (¶18); Filing 92 at 2; Filing 87-20 at 22:54–22:58. That same day, Fugett "submitted a kite to medical reporting that he had learned that one of his sexual partners from prior to his incarceration tested positive for gonorrhea" and "also reported bumps on his penis." Filing 87 at 8 (¶19); Filing 92 at 2; Filing 87-3 at 4 (¶14); Filing 87-11.[4]

Two days after submitting this kite, on October 7, 2019, Fugett was seen by a registered nurse. Filing 87 at 8 (¶20); Filing 87-3 at 4 (¶15); Filing 92 at 2; Filing 87-12. Fugett advised the nurse that his penile bumps would "come and go" but heal quickly. 87 at 8 (¶20); Filing 87-3 at 4 (¶15); Filing 92 at 2; Filing 87-12 at 8. Fugett "denied drainage and complications with urination but reported burning." Filing 87 at 8 (¶20); Filing 87-3 at 4 (¶15); Filing 92 at 2; Filing 87-12 at 8. Fugett was then "scheduled for a follow-up appointment with Dr. Montegut, who saw [Fugett] the next day." Filing 87 at 8 (¶20); Filing 87-3 at 4 (¶15); Filing 92 at 2; Filing 87-12 at 8. During his October 8, 2019, appointment with Dr. Montegut, Fugett "reported [that] his rash had resolved, denied any symptoms, and requested HIV and gonorrhea testing related to his sexual partners prior to incarceration." Filing 87 at 8 (¶20); Filing 87-3 at 4 (¶15); Filing 92 at 2; Filing 87-12 at 12.

---

[4] The kite specifically complained of "more bumps [and] sores on [his] penis." Filing 87-11.

Consistent with Fugett's request, Dr. Montegut ordered HIV, gonorrhea, and chlamydia testing. Filing 87 at 8–9 (¶20); Filing 87-3 at 4–5 (¶15); Filing 92 at 2; Filing 87-12 at 12.

On October 19, 2019, 11 days after he was seen by Dr. Montegut, Fugett's lab results came back positive for HIV-1. Filing 87 at 9 (¶21), Filing 87-3 at 5 (¶16); Filing 92 at 2; Filing 87-13 at 1. Fugett's gonorrhea and chlamydia tests came back negative a few days later on October 22, 2019. Filing 87 at 9 (¶21), Filing 87-3 at 5 (¶16); Filing 92 at 2; Filing 87-13 at 2. Dr. Montegut then met with Fugett that same day—October 22, 2019—to discuss the lab results. Filing 87 at 9 (¶21), Filing 87-3 at 5 (¶16); Filing 92 at 2; Filing 87-13 at 3. Dr. Montegut also referred Fugett "to infectious disease for an evaluation and scheduled follow-up chronic care treatment[.]" Filing 87 at 9 (¶21), Filing 87-3 at 5 (¶16); Filing 92 at 2; Filing 87-13 at 4. Fugett was also seen by behavioral health regarding his HIV results at this time. Filing 87 at 9 (¶21), Filing 87-3 at 5 (¶16); Filing 92 at 2; Filing 87-13 at 4–5.

On October 23, 2019—the day after Fugett learned of his HIV lab results—he had another visitor come to see him at DCC. Filing 87 at 9 (¶22); Filing 92 at 2; Filing 87-21. This was a different individual than the person who previously visited Fugett on October 5, 2019. *See generally* Filing 87-20; Filing 87-21; Filing 87-24 at 4–5. During their conversation, the visitor asked Fugett what gave him symptoms and Fugett responded, "No, I just knew I was fucking around with dirty people [ . . . ] you know." Filing 87 at 9 (¶22); Filing 92 at 2; Filing 87-21 at 02:52–03:02. When his visitor asked Fugett how he felt, Fugett said, "I feel normal." Filing 87 at 9 (¶22); Filing 92 at 2; Filing 87-21 at 03:27–03:32. Fugett later went on to tell his visitor, "I feel just like I did six, seven months ago, it's crazy." Filing 87 at 9 (¶22); Filing 92 at 2; Filing 87-21 at 18:30–18:40.

7

The same visitor from October 23, 2019, returned to visit Fugett again on November 7, 2019. Filing 87 at 9 (¶ 24); Filing 92 at 2; Filing 87-22; Filing 87-24 at 5. The following exchange occurred during their conversation:

> **Visitor**: You got to get on the meds. You gotta request a doctor, tell him you don't feel good.
>
> **Fugett**: That could be true. That might work.
>
> **Visitor**: Yeah, just say, you know what, "I can't sleep. Aren't you supposed to get night sweats . . . or something like that?"
>
> **Fugett**: Flu-like symptoms.
>
> **Visitor**: Yeah, tell 'em that's how you feel . . . Kinda push it.
>
> **Fugett**: Yeah, that's a good idea. That's actually a really good idea.
>
> **Visitor**: . . . So you feeling alright, though?
>
> **Fugett**: Yeah, I feel great . . . I just as [ ] good as the day I . . . got in here.

Filing 87 at 9–10 (¶24); Filing 92 at 2; Filing 87-22 at 09:45–10:17. Later on, Fugett told his visitor, "See, the bad thing is that I keep on forgetting that I'm sick and shit." Filing 87 at 9–10 (¶24); Filing 92 at 2; Filing 87-22 at 23:25–23:32.

The next day, November 8, 2019, Fugett's HIV-1 diagnosis was confirmed by the result of a blood draw. Filing 87 at 10 (¶25); Filing 87-3 at 5 (¶18); Filing 92 at 2; Filing 87-15. In addition, the blood draw results further revealed that Fugett had tested positive for syphilis. Filing 87 at 10 (¶25); Filing 87-3 at 5 (¶18); Filing 92 at 2; Filing 87-15. "Dr. Montegut ordered four millimeter intramuscular injections of penicillin once per week for 21 days." Filing 87 at 10 (¶25); Filing 87-3 at 5 (¶18); Filing 92 at 2; Filing 87-15 at 7. Fugett received these injections on November 22, 2019, November 29, 2019, and December 2, 2019. Filing 87 at 10 (¶25); Filing 87-3 at 5 (¶18); Filing 92 at 2; Filing 87-15 at 8–11.

Fugett submitted a kite addressed to "Medical" on December 2, 2019, in which he wrote the following: "Im [sic] on my way to Ote [sic] or Dodge Cnty, and havent [sic] got my meds from Infectious disease I was diagnosed Oct 22 with [indiscernible] HIV." Filing 83-14 at 199. Fugett was transferred from DCC to a different correctional facility on or about December 4, 2019. Filing 87 at 10 (¶26); Filing 87-3; Filing 92 at 2.[5]

## B.  Procedural Background

Fugett filed suit against Douglas County and Wellpath on March 2, 2021. Filing 1-1 at 2.[6] He did not name any individual defendants in this action apart from these two entities. *See* generally Filing 1-1. Fugett alleges in his Complaint that both Douglas County and Wellpath "had a duty to provide medical care to [him] and that [they] breached this duty by providing deficient medical care and/or by wrongfully delaying necessary medical tests and treatments and failing to provide reasonably required medical treatment and tests." Filing 1-1 at 5 (¶8). He specifically claims that the symptoms he suffered because of his infections "continued without treatment for a period of approximately seven (7) months from April 4, 2019, to November 2019" while at DCC. Filing 1-1 at 7 (¶14). Relying on a provision of the contract between Wellpath and Douglas County that said "[i]ndividuals who seek testing [for STDs] shall be tested[,]" Filing 32-2 at 71. Fugett posits that if his initial request for STD testing had been honored in accordance with this term of the contract, his HIV and syphilis infections would have been detected much earlier. *See* Filing 90 at 10. Filing 92 at 8. He further contends that the applicable standard of care required Douglas

---

[5] Fugett was later incarcerated at DCC again approximately 10 months later October 12, 2020. Filing 87 at 10 (¶27); Filing 87-3 at 6 (¶20); Filing 92 at 2. "During his initial screening, [Fugett] reported taking Biktarvy (an antiretroviral medication). His Biktarvy prescription was verified with UNMC, and Dr. Montegut prescribed him Biktarvy that day." Filing 87 at 10 (¶27); Filing 87-3 at 6 (¶20); Filing 92 at 2.

[6] Fugett initially filed suit in Nebraska state court, but the action was subsequently removed to this Court. *See* Filing 27 at 2. He moved to remand his state-law claims back to state court, but that motion was denied. *See* Filing 30 (adopting the Magistrate Judge's Findings and Recommendation in its entirety).

County and Wellpath to offer "opt out testing for all inmates" (*i.e.*, routinely testing all inmates at DCC for STDs upon admission unless they declined to be tested). Filing 90 at 9.

The Court previously ruled in Douglas County's favor and concluded that Fugett could not go forward against Douglas County on Count I of his Complaint because Douglas County retained sovereign immunity consistent with the Nebraska Political Subdivisions Tort Claims Act (PSTCA). Filing 42 at 9. The Court will now address the remaining Counts of Fugett's Complaint based upon the arguments raised in the Defendants' Motions for Summary Judgment.

## II.  LEGAL ANALYSIS

### A.  Preliminary Considerations

The Court notes at the outset that while both motions now before the Court have been styled as motions for "summary judgment," Douglas County's attack on Count II of the Complaint asserts a lack of subject-matter jurisdiction. *See* Filing 84 at 1. The United States Court of Appeals for the Eighth Circuit has recognized "the critical difference between Rule 12(b)(1), which governs challenges to subject-matter jurisdiction, and Rule 56, which governs summary judgment." *Osborn v. United States*, 918 F.2d 724, 729 (8th Cir. 1990). The Court will, therefore, address the specific standards that govern Douglas County's subject-matter jurisdiction challenge to Count II of the Complaint below in its analysis of that particular argument. The four other challenges in this case (*i.e.*, Wellpath's challenge to Counts I, II, and III, and Douglas County's challenge to Count III) do not allege a lack of subject-matter jurisdiction and are properly construed as motions for summary judgment. Thus, those challenges are governed by Rule 56 of the Federal Rules of Civil Procedure. *See generally* Fed. R. Civ. P. 56.

### B.  Rule 56 Standards

Pursuant to Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Rusness v. Becker Cnty.*, 31 F.4th 606, 614 (8th Cir. 2022) (quoting *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019), in turn quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The moving party bears the burden of showing the absence of a genuine dispute." *Glover v. Bostrom*, 31 F.4th 601, 603 (8th Cir.) (citing Fed. R. Civ. P. 56(a)), *reh'g denied*, No. 20-2884, 2022 WL 1564097 (8th Cir. May 18, 2022). The party opposing summary judgment must "cit[e] particular materials in the record" or show that the "materials cited do not establish the ... absence of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

On a motion for summary judgment, "a district court should 'not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue.'" *Avenoso v. Reliance Standard Life Ins. Co*., 19 F.4th 1020, 1024 (8th Cir. 2021) (quoting *Great Plains Real Est. Dev., L.L.C. v. Union Cent. Life Ins*., 536 F.3d 939, 943-44 (8th Cir. 2008)). Instead, the court must view the evidence in the light most favorable to the non-moving party and afford that party all reasonable inferences supported by the evidence. *Grinnell Mut. Reinsurance Co. v. Dingmann Bros. Constr. of Richmond, Inc*., 34 F.4th 649, 652 (8th Cir. 2022); *Pearson v. Logan Univ*., 937 F.3d 1119, 1124 (8th Cir. 2019). "The Supreme Court's 'repeated' admonition is that 'the plaintiff, to survive the defendant's [summary judgment] motion, need only present evidence from which a jury might return a verdict in his favor.'" *Doe by next friend Rothert v. Chapman*, 30 F.4th 766, 772 (8th Cir. 2022) (quoting *Anderson*, 477 U.S. at 257).

### C.  The Negligence Claims in Counts I and II of the Complaint

#### 1.  Preliminary Considerations

As a result of this Court's prior Order, Fugett no longer has an active claim against Douglas County on Count I. *See generally* Filing 42. However, the "Negligence" claim he alleges against

11

Wellpath in Count I remains. Wellpath does not separately address Fugett's claims in Count I and Count II. *See* Filing 87 at 15–21. Instead, it contends that the "negligence" claim in Count I and the "professional negligence" claim in Count II "are one and the same because both arise out of allegedly deficient medical care." Filing 87 at 15 n.2. Wellpath argues that the negligence claim in Count I should therefore be "subsumed" into the professional negligence claim in Count II. Filing 87 at 15 n.2. Fugett never addresses this contention. *See generally* Filing 92. He too consolidates his analysis of these negligence claims in his opposition brief. *See* Filing 92 at 5–11.

Count I of the Complaint alleges that Wellpath "voluntarily undertook the duty to provide medical care to inmates of DCC through a contractual agreement with Douglas County" and that Wellpath "voluntarily agreed to provide [Fugett] with all necessary medical care." Filing 1-1 at 10 (¶¶28, 30). Count I also alleges that Wellpath "breached its duty to provide [Fugett] with medical care" in several specific ways. *See* Filing 1-1 at 11–12 (¶32). Count I of the Complaint never alleges that Wellpath owed any other duty to Fugett apart from a duty to provide "medical care." *See* Filing 1-1 at 10-11. This is the same duty that Fugett claims he was owed in Count II of his Complaint that is captioned "Medical Malpractice, Medical Negligence." *See* Filing 1-1 at 13 (¶36) (alleging that Wellpath was "under a duty to provide medical care to inmates at DCC"). Thus, Wellpath's argument that Count I and Count II are really one and the same is not baseless.[7]

At the same time, Fugett makes several specific allegations in Count I of his Complaint that do not cleanly fit within a claim for professional negligence. For example, he alleges that Wellpath negligently breached its duty to provide him with proper medical care by, *inter alia*,

---

[7] Under Nebraska law, courts ask two questions in determining whether a plaintiff's negligence claim alleges "professional negligence." *See Churchill v. Columbus Cmty. Hosp. Inc.*, 830 N.W.2d 53, 56 (Neb. 2013) (considering this question to determine whether to apply Nebraska's four-year statute of limitations for general negligence claims or Nebraska's two-year statute of limitations for claims based on professional malpractice). The first question is "whether the defendants were professionals who provided professional services to [the plaintiff.]" *Id.* The second question is "whether the activity that caused [the plaintiff's] injuries was part of those professional services." *Id.*

failing to employ adequate staff and failing to maintain an adequate grievance system for the correction of inmate medical grievances. Filing 1-1 at 8 (¶32(a), (d)). While an argument can be made that these specific actions still qualify as "professional negligence" given that that they ultimately relate to the provision of medical care, it is ultimately unnecessary to make such a determination in this case. Regardless of whether Count I and Count II sound in ordinary or professional negligence, both claims require proof of causation.[8] Given that the Court can resolve this matter on that basis—for the reasons explained in further detail below—it declines to address Wellpath's threshold argument that Count I's "negligence" claim is subsumed within Count II's "professional negligence" claim. However, because the claims alleged against Wellpath in Count I and Count II both require proof of causation, it is nevertheless appropriate to address them together.

### 2.   *Fugett's Negligence Claims Against Wellpath in Counts I and II*

#### a.   The Parties' Arguments

Wellpath bases its "summary judgment motion [on] the lack of Plaintiff's expert medical opinions to support the essential element of causation." Filing 87 at 16 n.3. According to Wellpath, Fugett's claim "requires expert medical opinions to establish a causal link between the alleged breach of the standard of care and the damages claimed." Filing 87 at 16. Given the absence of any "expert opinions establishing that causal link[,]" Wellpath contends that it is entitled to summary judgment. Filing 87 at 16.

---

[8] *See Susman v. Kearney Towing & Repair Ctr., Inc.*, 970 N.W.2d 82, 91 (Neb. 2022) ("A plaintiff in ordinary negligence must prove all four essential elements of the claim: the defendant's duty not to injure plaintiff, a breach of that duty, proximate causation, and damages"); *Thone v. Reg'l W. Med. Ctr.*, 745 N.W.2d 898, 908 (Neb. 2008) ("In the medical malpractice context, the element of proximate causation requires proof that the physician's deviation from the standard of care caused or contributed to the injury or damage to the plaintiff").

In opposing Wellpath's Motion, Fugett submitted the deposition of Ryan D. Herrington, M.D., along with a copy of a report that Dr. Herrington authored in this case. *See* Filing 93 at 1.[9] However, Dr. Herrington affirmatively stated during his deposition that he would not be offering any opinion "that the lack of being seen by an infectious disease specialist while at Douglas County Corrections had any effect on Mr. Fugett's medical outcome[.]" *See* Filing 93-2 at 28. Dr. Herrington similarly testified during his deposition that he would not be offering "an opinion that the timing of treatment for Mr. Fugett's syphilis had any effect on his medical outcome[.]" *See* Filing 93-2 at 28. Consistent with these disclosures, Fugett does not suggest that he will support any of his negligence claims by relying on expert testimony to prove causation. *See generally* Filing 92. He instead contends that expert testimony is not required to show the "profound injury" he suffered as a result of Wellpath's negligence. *See* Filing 92 at 9. In support of this argument, Fugett cites Nebraska case law for the proposition that "[w]here the evidence and the circumstances are such that the recognition of the alleged negligence may be presumed to be within the comprehension of laymen, 'a prima facie case of professional negligence can be made without expert testimony.'" Filing 92 at 9 (citing *Thone*, 745 N.W.2d at 904) (in turn quoting *Halligan v. Cotton*, 227 N.W.2d 10, 13 (Neb. 1973)). Fugett argues that he has presented such a case capable of lay understanding because the injuries to his penis were "not a hidden or sophisticated symptom" and "[t]he course of a [sic] HIV infection is even more clear." Filing 92 at 10.[10]

---

[9] Wellpath submitted evidence attesting that Fugett has not disclosed any expert witnesses in this case other than Dr. Herrington. Filing 87-17 at 1–2 (¶¶4, 5); *see also* Filing 87 at 12 (¶36). Fugett's filings on this Motion do not suggest otherwise. *See generally* Filing 92.

[10] Fugett also dedicates a significant portion of his brief to address alleged failures by Wellpath to meet the applicable standard of care owed to Fugett and other inmates and further argues that Wellpath breached its contract with DCC. *See* Filing 92 at 5–8. Specifically, Fugett contends that summary judgment is inappropriate because "[a]t the very least there is conflicting evidence on what is the minimum standard of care with regard to the testing and treatment of inmates." Filing 92 at 8. These arguments are non-responsive to Wellpath's basis for summary judgment. Wellpath's summary judgment motion on Counts I and II is grounded in the failure by Fugett to establish causation

b.   Applicable Standards

"The proximate cause of an injury is that which, in a natural and continuous sequence, without any efficient intervening cause, produces the injury, and without which the injury would not have occurred." *McWhirt v. Heavy*, 550 N.W.2d 327, 336 (Neb. 1996). The Nebraska Supreme Court has held that expert testimony may be required to prove that a defendant's negligence was the proximate cause of the injury. *See e.g.*, *McVaney v. Baird, Holm, McEachen, Pedersen, Hamann & Strasheim*, 466 N.W.2d 499, 508 (1991) (concluding expert testimony was required to show that a utility provider's negligence was the proximate cause of an explosion at a hospital because "[s]tanding alone, the fact that a gas explosion due to a leak has occurred is not sufficient to demonstrate that a gas distributor's negligence was the proximate cause of the explosion"). To determine whether expert testimony is required to prove proximate cause, "the test is whether the particular issue can be determined from the evidence presented and the common knowledge and usual experience of the fact finders." *Id.*; *accord Pitts v. Genie Indus., Inc.*, 921 N.W.2d 597, 609 (Neb. 2019) (concluding that "technical matters" involving mechanical and electrical functioning were "well outside the scope of ordinary experience" such that the plaintiffs were required to present expert testimony in order to create a material issue of fact on the question of proximate cause in order to survive summary judgment).

In medical malpractice cases, "[e]xpert testimony is almost always required to prove proximate causation" under Nebraska law. *Thone*, 745 N.W.2d at 908. This is because "[i]n the absence of expert testimony on causation, the finder of fact would be left to resort to guess,

---

with expert testimony. Filing 87 at 15. Wellpath's argument does not rest on whether it complied with the applicable standard of care—its Opening Brief is quite clear on this point. *See* Filing 87 at 16 n.3 ("Wellpath in no way concedes that it or any of its employees or agents breached the applicable standard of care . . . However, the basis for this summary judgment motion is the lack of Plaintiffs' expert medical opinions to support the essential element of proximate causation").

speculation, or conjecture as to the issue." *Ewers v. Saunders Cnty.*, 958, 906 N.W.2d 653, 664 (Neb. 2018). Even in these cases, however, the "common-knowledge exception" allows causation to be "inferred without expert testimony if the causal link between the defendant's negligence and the plaintiff's injuries is sufficiently obvious to laypersons." *Id.* The Nebraska Supreme Court has explained that the "common-knowledge exception is a separate inquiry from whether a defendant's negligence is sufficiently plain that it, too, may be inferred by laypersons." *Id.* Accordingly, "it does not necessarily follow that causation can be inferred pursuant to the common-knowledge exception simply because a [professional's] negligence might be so inferred." *Id.* Where plaintiffs fail to provide expert testimony in medical malpractice cases, "they can only survive summary judgment" if they show that the injuries they suffered "so obviously stem from" the defendant's alleged negligence "that the causal link may be inferred even by laypersons." *See id.*

### c.  Discussion

In *Thone*, the Nebraska Supreme Court determined that summary judgment in the defendant's favor was appropriate because without expert testimony to support the causal element of the plaintiffs' negligence claim, there was "nothing to rebut the suggestion that [one of the plaintiffs] would have suffered the same amount of harm no matter how diligent [the defendants] had been." *See Thone*, 745 N.W.2d at 909. Thus, "their failure to provide expert testimony on the issue of proximate causation [was] fatal to [their] claim." *Id.* Much of the same can be said about Fugett's negligence claims against Wellpath.

To reiterate, Fugett does not allege that he contracted syphilis or HIV because of Defendants' negligence. Filing 1-1 at 4 (¶13); Filing 83-14 at 27.[11] Fugett's negligence claims

---

[11] Fugett admits in his Complaint that he "contracted Syphilis shortly before his incarceration began," Filing 1-1 at 4 (¶13), and Dr. Ryan Herrington stated during his deposition that he believed Fugett's HIV infection was present in his body when Fugett first arrived at DCC in April of 2019. Filing 87-19 at 15.

against Wellpath are directed at its supposed failure to detect, diagnose, and treat these conditions. *See* Filing 1-1 at 12 (¶33) (alleging that the Defendants' negligence as described in Count I "was the direct and proximate cause of Fugett suffering from completely undiagnosed and improperly treated Syphilis for a period of approximately six months as well as [Fugett's] undetected HIV infection"); Filing 1-1 at 14 (¶40) (alleging that the Defendants' negligence as described in Count II "was the direct and proximate cause of [Fugett] suffering from completely untreated and undiagnosed Syphilis and HIV for a period of approximately six months"). Fugett further contends that because Wellpath breached the duty of care it owed to him, he suffered "severe physical symptoms" such as "genital sores, painful urination, inflammation, itching, burning, tenderness, memory loss and other neurological issues." Filing 1-1 at 12 (¶34) (referring to the negligence alleged in Count I); *see also* Filing 1-1 at 14 (¶41) (making similar allegations on Count II).

Fugett briefly cites Dr. Herrington's testimony in opposing Wellpath's Motion. *See* Filing 92 at 6, 9. However, the problem for Fugett is that this testimony notably lacks any opinion sufficient to generate a material question of fact on the actual matter at issue here—proximate cause. Dr. Herrington noted during his deposition that he had been retained in order "to review Mr. Fugett's medical records and assess . . . the medical care and treatment that he's been provided and to opine on how that comports with the standard of care." Filing 93-2 at 4. He testified that in his opinion the standard of care required Wellpath and Douglas County "to offer opt-out testing to every inmate that came into Douglas County Corrections[.]" Filing 93-2 at 18. In other words, it was his opinion that "the standard of care required every inmate upon admission to be given the option to have their blood tested and sent out for the lab." Filing 93-2 at 26. Yet, none of this relates to proximate cause.

Indeed, Dr. Herrington made clear during his deposition that he would not be offering any opinion that Fugett should have received a specific type of treatment based on his HIV status at any particular point in time because such an opinion "would be outside the scope of [his] practice." Filing 93-2 at 24. He further clarified that he would not be offering any opinion "as to the effect that [Fugett's] HIV-positive status had on him and his health condition between his positive test and his release[.] Filing 93-2 at 28. He later said that he would not be offering any opinions as to whether "the lack of being seen by an infectious disease specialist while at [DCC] had any effect on [Fugett's] medical outcome[.]" Filing 93-2 at 28. Nor would he be offering any opinion "that the timing of treatment for [Fugett's] syphilis at [DCC] had any effect on his medical outcome." Filing 93-2 at 28. Dr. Herrington further disavowed any intention "to offer an opinion related to the manner in which an inmate submits medical requests." Filing 92-3 at 35. Therefore, even if Dr. Herrington's opinions were sufficient to establish a material question of fact as to the requisite standard of care that Wellpath owed Fugett, these opinions do not provide any insight on whether the failure to meet that standard of care proximately caused the injuries Fugett alleges. Because Fugett has no expert testimony to support the causal element of his negligence claims, he can only succeed at this stage if the "issue can be determined from the evidence presented and the common knowledge and usual experience of the fact finders." *Pitts*, 921 N.W.2d at 609. This he cannot do.

Without expert testimony, "the finder of fact would be left to resort to guess, speculation, or conjecture" in determining whether the injuries Fugett claims to have suffered were the proximate cause of Wellpath's alleged negligence or whether these injuries would have come about anyway as the natural result of infections that pre-dated his term of incarceration. *See Ewers*, 906 N.W.2d at 664. The Court agrees with Wellpath that "the manner in which symptoms of a bacterial infection like syphilis or a virus like HIV manifest themselves . . . and whether any

18

treatment at all could have alleviated any alleged suffering or arrested the progress of either disease at any particular time . . . [is] beyond common knowledge. Filing 94 at 14; *cf. Savage v. Pilot Travel Centers, L.L.C.*, 464 F. App'x 288, 291 (5th Cir. 2012) (noting that "common sense, on its own, cannot rule out an STD as the cause of skin lesions; medical expertise is required"); *Verhage v. Verhage*, No. 12-04-00309-CV, 2006 WL 1791565, at *7 (Tex. App. June 30, 2006) (concluding that whether one individual "caused the other to contract genital herpes is not a question that can be answered by general experience and common sense" and that expert testimony was, therefore, required).

There is "nothing to rebut the suggestion that [Fugett] would have suffered the same amount of harm no matter how diligent [Wellpath] had been." *See Thone*, 745 N.W.2d at 909. Even when viewing the evidence in the light most favorable to Fugett and affording him all reasonable inferences, *Grinnell Mut. Reinsurance Co.*, 34 F.4th at 652, the Court concludes that he has failed to put forth sufficient evidence to generate a jury question on the causal connection between Wellpath's alleged negligence and the harm Fugett claims to have suffered as a result. Fugett has neither produced expert testimony on the precise issue of causation, nor has he established that this causal link would be so sufficiently obvious to laypersons that they would be able to determine this matter without resorting to guess, speculation, or conjecture[.]" *Ewers*, 906 N.W.2d at 664. The Court therefore grants summary judgment in Wellpath's favor on Counts I and II of the Complaint.

3. *Fugett's "Medical Malpractice, Medical Negligence" Claim against Douglas County in Count II*

a. The Parties' Arguments

Douglas County argues that it is entitled to summary judgment on the claims presented in Count II of Fugett's Complaint because "Count II describes allegedly negligent conduct of a

contractor, and Douglas County has not waived its sovereign immunity for the actions of contractors under [the PSTCA]." Filing 84 at 1; *see also* Filing 82 at 1. Accordingly, Douglas County posits that this Court lacks subject-matter jurisdiction on the claims made against Douglas County in Count II of the Complaint. *See* Filing 84 at 1. Fugett's opposition brief does not specifically address Douglas County's PSTCA arguments with precision. *See generally* Filing 84.[12] Fugett responds more generally by contending that "Douglas County controls through the contract with Wellpath the [s]tandard of [c]are at issue in this case" and that "Douglas County's control over the provision of [m]edical [c]are was granular and direct on the individual inmate as well." Filing 90 at 9–10. Thus, in Fugett's view, Douglas County did not completely delegate medical care decisions to Wellpath. Filing 90 at 10.

> b.   Applicable Standards

> > i.   Preliminary Considerations

As the Court previously noted, Douglas County has moved for "summary judgment" on Count II of the Complaint based upon a lack of subject-matter jurisdiction. *See* Filing 84 at 1. Douglas County's "decision to challenge subject–matter jurisdiction via a summary–judgment motion raises procedural issues that deserve explanation." *Smith v. Bradley Pizza, Inc.*, No. 17CV02032ECTKMM, 2019 WL 2448575, at *2 (D. Minn. June 12, 2019), *aff'd*, 821 F. App'x 656 (8th Cir. 2020). Some district court decisions in the Eighth Circuit have concluded that it is improper to style a motion to dismiss for lack of subject–matter jurisdiction as a summary judgment motion. *See e.g.*, *Yanouskiy v. Eldorado Logistics Sys., Inc.*, No. 8:06CV674, 2007 WL

---

[12] Douglas County makes a point of emphasizing that Fugett did not respond to this argument in its reply brief. *See* Filing 95 at 3 (arguing "[p]laintiff did not address the fact that under the PSTCA's limited waiver of sovereign immunity, the Legislature waived immunity as it relates only to 'the negligent or wrongful act or omission of any *employee* of the political subdivision'") (emphasis in original); Filing 95 at 4 (contending "[p]laintiff's total avoidance of this issue and failure to address legal authority cited by Douglas County is abandonment under this Court's local rule NECivR 39.2").

3203113, at *2 (D. Neb. Oct. 29, 2007); *Raper v. Iowa*, 940 F. Supp. 1421, 1423 (S.D. Iowa 1996), *aff'd*, 115 F.3d 623 (8th Cir. 1997). This would appear to be the prevailing view. *See* 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1350 (3d ed.) ("Federal courts have concluded that . . . in most circumstances, a Rule 56 motion for summary judgment [is an] inappropriate method[ ] for challenging the district court's subject matter jurisdiction"); *see also Bradley Pizza*, 2019 WL 2448575, at *2 ("The nature of the subject-matter jurisdiction inquiry and the functions served by Rule 12(b)(1) and Rule 56 have prompted courts to conclude that the question of subject-matter jurisdiction should not be resolved on summary judgment") (citing *Capitol Leasing Co. v. Fed. Deposit Ins. Corp.*, 999 F.2d 188, 191 (7th Cir. 1993) (per curiam) ("In short, the question of jurisdiction is inappropriate for summary judgment, and discussing the interplay of Rule 12(b)(1) and Rule 56 verges on non sequitur") (citations omitted)).

At the same time, the Eighth Circuit has noted that "[m]otions to dismiss for lack of subject-matter jurisdiction can be decided in three ways: [1] at the pleading stage, like a Rule 12(b)(6) motion; [2] on undisputed facts, like a summary judgment motion; and [3] on disputed facts." *Jessie v. Potter*, 516 F.3d 709, 712 (8th Cir. 2008). As one decision from the District of Minnesota observed three years ago,

> [T]hough our Eighth Circuit Court of Appeals has approved of a district court recharacterizing a summary-judgment motion challenging subject-matter jurisdiction as a motion to dismiss under Rule 12(b)(1), it has not announced a general rule requiring that to be done and, in fact, has reviewed district-court orders entering summary judgment for want of subject-matter jurisdiction without questioning the propriety of that procedure[.]

*Bradley Pizza*, 2019 WL 2448575, at *2.

Douglas County may have couched their challenge to Count II in Rule 56, but the Court is not bound by this framing of the matter particularly given the Court's *sua sponte* "obligation to consider whether it has subject matter jurisdiction in every case." *Hart v. United States*, 630 F.3d 1085,

1089 (8th Cir. 2011). Even if the Court could resolve Douglas County's subject-matter jurisdiction argument on summary judgment, the more prudent practice is to follow the prevailing view and apply Rule 12(b)(1) standards rather than Rule 56 standards. Doing so better adheres to the Eighth Circuit's approach. *See In re Swanson Farms*, 105 F.3d 663 (8th Cir. 1997) (Table) ("We conclude that, although the district court should have dismissed the case under Federal Rule of Civil Procedure 12(b)(1) (lack of subject matter jurisdiction) rather than through summary judgment, the case was properly dismissed").[13]

### ii. Rule 12(b)(1) Standards

The Eighth Circuit has explained that on a Rule 12(b)(1) motion,

> The plaintiff bears "the burden of proving the existence of subject matter jurisdiction," and we may look at materials "outside the pleadings" in conducting our review. [*Herden v. United States*, 726 F.3d 1042, 1046 (8th Cir. 2013) (en banc)] (quoting *Green Acres Enters., Inc. v. United States*, 418 F.3d 852, 856 (8th Cir. 2005)). Because of the "unique nature of the jurisdictional question," *Osborn v. United States*, 918 F.2d 724, 729 (8th Cir. 1990) (citation omitted), it is the court's duty to "decide the jurisdictional issue, not simply rule that there is or is not enough evidence to have a trial on the issue," *id. at 730*. As such, if the court's inquiry extends beyond the pleadings, it is not necessary to apply Rule 56 summary judgment standards. *Id. at 729*. Rather, the court may receive evidence via "any rational mode of inquiry," and the parties may "request an evidentiary hearing." *Id. at 730* (quoting *Crawford v. United States*, 796 F.2d 924, 928 (7th Cir. 1986)). Ultimately, the court must rule upon "the jurisdictional issue [unless it] is 'so bound up with the merits that a full trial on the merits may be necessary to resolve the issue.'" *Id.* (quoting *Crawford*, 796 F.2d at 928).

---

[13] The Court recognizes that when it previously ruled in Douglas County's favor and dismissed the claim in Count I against Douglas County, it stated that Douglas County was entitled to sovereign immunity and then granted "Douglas County's motion for summary judgment as to Count I." Filing 42 at 18. The Court also noted in its prior Order that "[s]overeign immunity is jurisdictional in nature, and courts have a duty to determine whether they have subject matter jurisdiction over a matter." Filing 42 at 7 (citing *Burke v. Bd. of Trs. of Neb. State Colleges*, 924 N.W.2d 304, 309 (Neb. 2019)). Although the Court might have resolved Douglas County's prior Motion by applying Rule 12(b)(1) standards rather than Rule 56 standards, the end result would have been the same either way. *Cf. Cox v. Fritz*, 56 F.3d 68 (8th Cir. 1995) (Table) ("Even if the district court should not have applied summary judgment standards . . . any error the district court committed in converting the Rule 12(b)(1) motion to a summary judgment motion was harmless). In any event, a "district court has the inherent power to reconsider and modify an interlocutory order any time prior to the entry of judgment." *K.C. 1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1017 (8th Cir. 2007) (quoting *Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1070 (8th Cir. 1995)). Consistent with this authority, the Court takes this opportunity to further clarify its prior Order (Filing 42) and make clear that it lacked subject-matter jurisdiction over the claim Fugett raised against Douglas County in Count I of the Complaint.

*Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019); *Am. Fam. Mut. Ins. Co. v. Vein Centers for Excellence, Inc.*, 912 F.3d 1076, 1081 (8th Cir. 2019) ("[A] motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) raises a factual challenge to the court's jurisdiction, and courts may look to evidence outside the pleadings and make factual findings." (citing *Davis v. Anthony, Inc.*, 886 F.3d 674, 679 (8th Cir. 2018)).

The *Buckler* decision suggests that a challenge to subject-matter jurisdiction pursuant to Rule 12(b)(1) is always "factual," but "facial" challenges are also possible:

> In deciding a motion under Rule 12(b)(1), the district court must distinguish between a facial attack—where it looks only to the face of the pleadings—and a factual attack—where it may consider matters outside the pleadings. *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir.1990). In a factual attack, the "non-moving party does not have the benefit of 12(b)(6) safeguards." *Id.* If the jurisdictional issue is "bound up" with the merits of the case, the district court may "decide whether to evaluate the evidence under the summary judgment standard." *Moss v. United States*, 895 F.3d 1091, 1097 (8th Cir.2018). This court is bound by the district court's characterization of the Rule 12(b)(1) motion. *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir.2016) ("The method in which the district court resolves a Rule 12(b)(1) motion—that is, whether the district court treats the motion as a facial attack or a factual attack—obliges us to follow the same approach.").

*Croyle by & through Croyle v. United States*, 908 F.3d 377, 380–81 (8th Cir. 2018).

c.   Discussion

As the plaintiff, Fugett "has the burden of establishing subject matter jurisdiction[.]" *Jones v. Gale*, 470 F.3d 1261, 1265 (8th Cir. 2006). To meet this burden, Fugett would need to show that Douglas County waived its sovereign immunity from suit consistent with the PSTCA because "[a] waiver of sovereign immunity is found only where stated by the most express language of a statute or by such overwhelming implication from the text as will allow no other reasonable construction." *Edwards v. Douglas Cnty.*, 953 N.W.2d 744, 751 (Neb. 2021). Fugett has not met his burden to establish subject-matter jurisdiction on its claim in Count II against Douglas County. Therefore,

23

the Court will dismiss the claims Fugett makes against Douglas County in Count II of the Complaint for want of subject-matter jurisdiction.

> i. Fugett Judicially Admitted that Wellpath is an Independent Contractor

Fugett's own Complaint contains several judicial admissions that collectively preclude subject-matter jurisdiction over his claim against Douglas County on Count II.[14] Fugett's Complaint asserts as fact that "[t]he Defendant Douglas County is a county within the meaning of the Nebraska Political Subdivisions Tort Claims Act." Filing 1-1 at 5 (¶5). Fugett's Complaint likewise asserts as fact that Wellpath "was, at all relevant times, a medical care contractor for DCC." Filing 1-1 at 15 (¶47). The plain text of the PSTCA provides that the term "employee" of a political subdivision "shall not be construed to include any contractor with a political subdivision." Neb. Rev. Stat. § 13-903(3).

This prevents Fugett from meeting his burden of proving subject-matter jurisdiction with respect to its claim against Douglas County in Count II because "the PSTCA provides the exclusive means by which to maintain a tort claim against a political subdivision and its employees." *Edwards, 953 N.W.2d at 759* (internal quotation marks omitted). If Wellpath "was, at all relevant times, a medical care contractor for DCC"—as Fugett has pleaded—then there can be no claim against Douglas County consistent with the PSTCA. See Filing 1-1 at 15 (¶47). Contractor status may permit Fugett's claim in Count II to go forward against Wellpath in accordance with the PSTCA, but it is this same status that necessarily forecloses Fugett's concurrent claim against Douglas County.

---

[14] The Eighth Circuit has "held that 'judicial admissions are binding for the purpose of the case in which the admissions are made including appeals.'" *Pinos Gonzalez v. Barr*, 929 F.3d 595, 597 (8th Cir. 2019) (quoting *State Farm Mut. Auto. Ins. Co. v. Worthington*, 405 F.2d 683, 686 (8th Cir. 1968)). This includes factual statements made in a party's pleadings. *See Knudsen v. United States*, 254 F.3d 747, 752 (8th Cir. 2001).

ii. The Evidence before the Court Likewise Supports the
Conclusion that Wellpath is an Independent Contractor

Even if this Court were to disregard Fugett's judicial admission that Wellpath was a "contractor," the Court concludes on the record before it that Wellpath was, indeed, a contractor.[15] The Court notes at the outset that the Contract says, "Medical personnel are not DCDC employees. They are employed by CCS/WELLPATH with whom Douglas County contracts to provide comprehensive care for Inmates." Filing 83-1 at 4. However, as Douglas County correctly notes in its reply brief, courts commonly consider 10 factors in determining whether an individual is an independent contractor or an employee under Nebraska law. Filing 95 at 6 (citing *Miller v. Union Pac. R.R. Co.*, 526 F. Supp. 3d 494, 510 (D. Neb. 2021)); *see also Kime v. Hobbs*, 562 N.W.2d 705, 711 (Neb. 1997). They are:

> (1) the extent of control which, by the agreement, the employer may exercise over the details of the work; (2) whether the one employed is engaged in a distinct occupation or business; (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the employer or the one employed supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the one employed is engaged; (7) the method of payment, whether by the time or by the job; (8) whether the work is part of the regular business of the employer; (9) whether the parties believe they are creating an agency relationship; and (10) whether the employer is or is not in business.

*Kime*, 562 N.W.2d at 711. No single factor is dispositive, but "[t]he right of control is the chief factor distinguishing an employment relationship from that of an independent contractor." *Id.*

---

[15] Because the Court considers Douglas County's subject-matter jurisdiction argument as a factual attack pursuant to Rule 12(b)(1), Fugett is not entitled to have the evidence viewed in the light most favorable to him on this issue. "[I]t is the court's duty to decide the jurisdictional issue, not simply rule that there is or is not enough evidence to have a trial on the issue. As such, if the court's inquiry extends beyond the pleadings, it is not necessary to apply Rule 56 summary judgment standards." *Buckler*, 919 F.3d at 1044.

(1) Douglas County Did Not Exercise a Degree of
Control Sufficient to Conclude that Wellpath and
its Agents were Employees of Douglas County

Beginning with the first and "chief" factor, both Douglas County and Fugett agree that the Contract language provided, "Wellpath is responsible all decisions relating to the delivery of health care services at [DCC], including for on-site services as well as off-site services." Filing 84 at 5 (¶10); Filing 90 at 5 (¶10); Filing 32-2 at 45. Douglas County and Fugett likewise agree that the Contract language provided that "Wellpath's personnel, employees, agents, or contractors are not agents, employees, partners, joint ventures or associates of Douglas County and vice versa." Filing 84 at 5–6 (¶13); Filing 90 at 5 (¶13); Filing 32-2 at 25–26. Both parties further acknowledge that the Contract says that an employee of Wellpath shall not be deemed or construed to be the employee or agent of Douglas County "for any purpose whatsoever." 84 at 5–6 (¶13); Filing 90 at 5 (¶13); Filing 32-2 at 25–26. This contract language strongly supports the conclusion that Wellpath and its agents were independent contractors who were not subject to Douglas County's control in the performance of their duties.

Fugett nevertheless contends that regardless of what the Contract may have said, its language did not reflect the reality of their relationship. Filing 90 at 3 (¶¶ 10, 11); Filing 90 at 5 (¶¶ 10, 11, 13). He submits that "Douglas County did in fact control the medical care provided to inmates." Filing 90 at 7 (¶29). However, the only evidence Fugett cites to support this contention is the deposition testimony of Mary Earley (an employee of Douglas County) and Dr. Jacqueline Esch (a former employee of Wellpath). See Filing 90 at 10.[16] Neither of these depositions were

---

[16] The combined length of these transcripts is approximately 480 pages. See Filing 91-5; Filing 91-6. Although Fugett provided these depositions in their entirety along with his brief opposing Douglas County's Motion for Summary Judgment, his citations to these depositions in his brief are quite limited. Fugett exclusively cites to excerpts from Dr. Esch's deposition contained at Filing 91-6 at 32–34. See Filing 90 at 3–6 (citing Dr. Esch's deposition testimony at 127:4–128:13; 129:8–23; 131:7–133:19). Fugett's only citation to Earley's deposition is Filing 91-5 at 9. See Filing 90 at 4 (citing Early's deposition testimony at 36:5–20). The Court will consider these specific citations

given in connection with Fugett's case. They relate to different cases brought by different plaintiffs. *See* Filing 91-5 at 1; Filing 91-6 at 1. These depositions are also not as helpful to Fugett's position as he would suggest. For instance, Earley made a point of noting during her deposition that she did not "supervise" the contract, she "monitor[ed] the contract." Filing 91-5 at 9. Dr. Esch's testimony is even less relevant because she left Wellpath in 2018—well before Fugett was incarcerated at Douglas County and even before Doulas County entered the relevant contract with Wellpath that is at issue in this case. *See* Filing 91-5 at 5; Filing 91-6.[17] Moreover, Dr. Esch stated during her deposition that even though Earley "spent a lot of time in medical charts checking up on and things and giving her two cents," to her knowledge Earley did not "ever overrule any of [her] decisions on not providing care" to inmates. Filing 91-6 at 33. So even if Dr. Esch believed that Earley "might have overstepped" by putting her input into medical issues, Dr. Esch also said that if Earley "asked about appropriate medical care, we told her the appropriate medical care was completed or was being completed, that it was taken care of." Filing 91-6 at 33–34. Accordingly, Fugett has failed to show that Douglas County exerted a sufficient degree of control over Wellpath such that Wellpath's agents could be considered Douglas County employees rather than agents of an independent contractor—let alone under the contract that was in effect at the time Fugett was incarcerated. This factor, therefore, weighs in favor of finding that Wellpath was an independent contractor.

---

that he relies upon. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record"); *see also Rodgers v. City of Des Moines*, 435 F.3d 904, 908 (8th Cir. 2006) ("[W]e will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments").

[17] There is conflicting evidence in the record as to whether Dr. Esch resigned from Wellpath in July of 2018 (*see* Filing 91-5 at 5) or February of 2018 (*see* Filing 91-6 at 33). Either way, her employment with Wellpath ceased before the pertinent contract between Wellpath and Douglas County in this case went into effect. *See* Filing 32-2 at 1 (noting that the contract will commence on March 1, 2019).

(2) Considered in Their Totality, the Remaining Factors Also Support the Conclusion that Wellpath was an Independent Contractor

On balance, the remaining factors also clearly support this conclusion. The second factor weighs in favor of finding that Wellpath is an independent contractor because Wellpath is a corporation that supplies "medical care services to correctional facilities[,]" and, thus, is engaged in a distinct business. *See* Filing 1-1 at 4 (¶3). The third factor weighs in favor of finding that Wellpath operated as an independent contractor because the record "reflects that there [was] very little direct supervision of" Wellpath medical providers by Douglas County. *See Pettit v. State*, 544 N.W.2d 855, 862 (Neb. 1996) (noting that even if an individual was operating under a Nebraska governmental entity's directives in the performance of her duties, the fact that she was primarily supervised by an individual outside of that governmental entity suggested independent contractor status under the third factor).[18]

The fourth factor weighs in favor of finding that Wellpath is an independent contractor given that the provision of comprehensive medical care—particularly within the corrections environment—requires a specific skillset. *See* Filing 83-3 at 3 (¶9) (Earley describing correctional health care as "a niche practice area"). The seventh factor weighs in favor of finding that Wellpath is an independent contractor because the contract set a flat rate for the base price of the contract that was to be paid in monthly increments and Wellpath was also required to submit a monthly

---

[18] This conclusion is supported by the affidavit that Earley produced in this case. *See* Filing 83-3. In it, Earley expressly denied intervening in medical care, directing medical care or treatments, or overruling medical care of decisions by medical professionals. Filing 83-3 at 7 (¶17). She further states in her affidavit that although she "monitor[s] the Contract and investigate[s] complaints about medical care, [she] do[es] not have authority or control over [Wellpath] personnel, and [she] never [has]." Filing 83-3 at 7 (¶19). She goes on to note in her affidavit that she "do[es] not believe that anyone at Douglas County, including [herself], has the power to hire or fire [Wellpath] employees" consistent with the Contract. Filing 83-3 at 8 (¶20). This conclusion is further supported by the affidavit that Michael Myers provided in connection with this case. *See* Filing 83-1 at 3 (¶5) (averring that in his capacity as the Director of Corrections for Douglas County, he "do[es] not have direct oversight of the efforts of [Wellpath] personnel").

invoice to Douglas County detailing the services that it performed. Filing 32-2 at 15, 26. Accordingly, Wellpath was paid by the job rather than the time expended. *See Pettit*, 544 N.W.2d at 862 (evidence that an individual was paid by the hour weighed in favor of finding that she was an employee rather than a contractor). The ninth factor weighs in favor of finding that Wellpath was an independent contractor because the contract language expressly disavowed any intention to create an agency relationship between the parties. *See* Filing 32-2 at 25–26.[19] For the foregoing reasons, the Court finds that Wellpath was an independent contractor rather than an employee of Doulas County. Thus, Douglas County did not waive its sovereign immunity over such claims under the PSTCA. This means that Fugett's claim against Douglas County in Count II of his Complaint lacks subject-matter jurisdiction.

### D.  The Constitutional Claims Brought Pursuant to 42 U.S.C. § 1983 in Count III of the Complaint

*1.  Fugett's Constitutional Claim Against Wellpath in Count III*

a.  The Parties' Arguments

Wellpath raises several arguments as to why Fugett's constitutional claim for deliberate indifference to his serious medical needs fails. *See* Filing 87 at 22, 28. It specifically contends that Fugett's claim is deficient because (1) he failed to prove a causal connection through expert testimony, (2) the undisputed facts do not support a finding of gross neglect or criminal

---

[19] The four remaining factors are not as directly applicable under this set of facts, but do not clearly suggest a contrary conclusion—especially when weighed against all the other factors in this case that plainly suggest Wellpath's status as an independent contractor. The fifth factor is somewhat inapposite because Wellpath necessarily was required to perform its duties within the confines of a jail; thus, Douglas County necessarily supplied the "place of work." The sixth factor is indeterminate because neither party has suggested one way or the other whether the length of the contract in this case is of a lengthy duration in this context. The eighth and tenth factors are also somewhat unhelpful in resolving this matter because even though Douglas County Corrections might not be in the regular "business" of providing medical care, it was nevertheless charged by law with the responsibility for providing reasonably necessary medical, psychiatric, dental, and other health care services for persons remanded to its care, custody and control[.]" Filing 32-2 at 1. To the extent that any of these four factors may marginally weigh in favor of finding an "employer" status when considered in isolation, they are significantly outweighed by the totality of the remaining factors that clearly support the opposite conclusion.

recklessness on the part of Wellpath, and (3) Fugett failed to show a widespread persistent pattern of unconstitutional conduct necessary to impose liability against Wellpath. Filing 87 at 22, 28.[20] Fugett responds that Wellpath's failure "to treat him for [47] days [after testing positive for HIV] before releasing him into the public in a contagious state is far beyond deliberate indifference, it is intentional abuse of both inmate [sic] and the community." Filing 92 at 10. He notes that Wellpath knew that he had tested positive for HIV and further claims it is "undisputed" that "Wellpath failed and refused to treat him during his incarceration[.]" Filing 92 at 10. Fugett also states that "HIV is an objectively serious condition" and summary judgment is inappropriate. Filing 92 at 10.

b.   Applicable Standards

"Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's ban against cruel and unusual punishments." *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009) (citing *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)). An Eighth Amendment deliberate indifference claim requires a plaintiff to "demonstrate that he suffered from an objectively serious medical need and that [the defendants] actually knew of but deliberately disregarded the need." *Santiago*, 707 F.3d at 990. Thus, "the deliberate indifference standard has both objective and subjective prongs." *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016), *as amended* (Mar. 4, 2016). The same standard applies under the Fourteenth Amendment when pretrial detainees allege a deliberate indifference claim. *See Jackson v. Buckman*, 756 F.3d 1060,

---

[20] "Section 1983 secures most constitutional rights from infringement by governments, not private parties. Where a private party acts under color of state law, however, it can be held liable under § 1983." *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 590 (8th Cir. 2004) (internal quotation omitted). "To be liable under § 1983, a private actor must be a 'a willful participant in joint activity with the State' in denying a plaintiff's constitutional rights." *Magee v. Trustees of Hamline Univ.*, Minn., 747 F.3d 532, 536 (8th Cir. 2014) (quoting *Dossett v. First State Bank*, 399 F.3d 940, 947 (8th Cir. 2005)). Wellpath never suggests in its brief that it cannot be sued pursuant to 42 U.S.C. § 1983. *See generally* Filing 87. Therefore, the Court will assume for the sake of ruling on this Motion that Wellpath can be held liable for the claimed constitutional violations brought pursuant to 42 U.S.C. § 1983 in this case.

1065 (8th Cir. 2014) (noting that the although the plaintiff's status as a pretrial detainee entitled him to medical care under the Due Process Clause of the Fourteenth Amendment, courts still "apply the deliberate–indifference standard that governs claims brought by convicted inmates under the Eighth Amendment").[21]

With respect to the objective prong, "[a] serious medical need is 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Santiago*, 707 F.3d at 990 (quoting *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)). When a plaintiff's deliberate indifference claim is "based on a delay in medical treatment," the Eighth Circuit has instructed that courts are to "measure 'the objective seriousness of the deprivation . . . by reference to the *effect* of delay in treatment.'" *Jackson v. Riebold*, 815 F.3d 1114, 1119 (8th Cir. 2016) (emphasis in original) (internal quotation marks omitted). "To establish this effect, the inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Id.* (cleaned up). Thus, when an inmate submits evidence documenting his diagnosis and treatment but does not offer "evidence establishing that any delay in treatment had a detrimental effect, the inmate [f]ails to raise a genuine issue of fact on an essential element of his claim." *Id.* at 1120 (cleaned up); *see also Hancock v. Arnott*, 39 F.4th 482, 486 (8th Cir. 2022) (concluding that because the plaintiff "did not establish a detrimental effect of the delay in treatment [that] means that he has not established a serious medical need").

The subjective prong (*i.e.*, whether defendants actually knew about and deliberately disregarded such a need) presents "an extremely high standard that requires a mental state of

---

[21] Wellpath notes in their Opening Brief that "[t]he record is unclear as to whether Plaintiff was a pretrial detainee or a convicted inmate at all times relevant to his claims." Filing 87 at 22 n.4.

'more . . . than gross negligence.'" *Saylor*, 812 F.3d at 644 (quoting *Fourte v. Faulkner Cty., Ark.*, 746 F.3d 384, 387 (8th Cir. 2014)). "Even medical malpractice does not automatically constitute deliberate indifference." *Saylor*, 812 F.3d at 644. Instead, "deliberate indifference requires a highly culpable state of mind approaching actual intent." *Kulkay v. Roy*, 847 F.3d 637, 643 (8th Cir. 2017) (quoting *Choate v. Lockhart*, 7 F.3d 1370, 1374 (8th Cir. 1993)); *see also Saylor*, 812 F.3d at 644 (describing the deliberate indifference threshold as "akin to criminal recklessness"). Moreover, "[t]he defendant-official's state of mind must be measured by the official's knowledge at the time in question, not by hindsight's perfect vision." *Kulkay*, 847 F.3d at 643 (internal quotation marks omitted).

### c.   Discussion

Fugett's Constitutional claim against Wellpath based on its alleged indifference to his serious medical needs is deficient for at least two reasons. First, his claim hinges on the theory that Wellpath improperly delayed medical treatment. *See* Filing 1-1 at 16 (¶48) (alleging that Wellpath violated Fugett's his constitutional rights because it "denied and delayed treatment with deliberate indifference to [his] serious medical needs"); Filing 1-1 at 17 (¶50) (alleging that Fugett suffered injuries "[a]s a result of the delay in obtaining medical treatment"). Eighth Circuit precedent is clear that these types of claims require a plaintiff to "place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Jackson*, 815 F.3d at 1119. He has not done so here.

Again, Dr. Herrington plainly stated during his deposition that he would not be offering an opinion on any of the following subjects: (a) whether Fugett's failure to be seen by an infectious disease specialist while at DCC had "any effect" on his medical outcome (Filing 93-2 at 28); (b) whether Fugett should have received a specific type of treatment based on his HIV status at any particular point in time (Filing 93-2 at 24); (c) the effect that Fugett's HIV-positive status had on

him and his health condition between the time of his positive test and his release (Filing 93-2 at 28); or (d) whether the timing of Fugett's syphilis treatment had any effect on his medical outcome (Filing 93-2 at 28). Moreover, in the written report that Dr. Herrington completed prior to his deposition he similarly limited his opinions to matters regarding compliance with the standard of care. *See* Filing 93-1 at 13–15. Dr. Herrington repeatedly opined in this report that had the standard of care been met, Fugett could have received timely and appropriate treatment. Filing 93-1 at 13–14. However, at no point in his report did Dr. Herrington offer an opinion that any delay in treatment had a detrimental impact on Fugett's medical condition. Accordingly, even if this Court were to assume that there was a delay in medical treatment, Fugett has failed to raise a genuine issue of fact on an essential element of his claim because he has not provided medical evidence establishing that any such delay in treatment had a detrimental effect on him or changed his prognosis. *See Jackson*, 815 F.3d at 1120 n.4 (compiling cases); *Hancock*, 39 F.4th at 487. When viewing the evidence in the light most favorable to him and affording him all reasonable inferences, Fugett cannot survive summary judgment because he has failed to "present evidence to support the serious medical need he ha[s] pleaded." *Hancock*, 39 F.4th at 486.

Second, Fugett's Constitutional claim against Wellpath also fails given that it has not been brought against any person in their individual capacity but has, instead, been brought against Wellpath's corporate form in accordance with *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 (1978).[22] The Eighth Circuit has repeatedly held that for liability to attach to a defendant that has

---

[22] Although *Monell* claims typically involve governmental entities, the Eighth Circuit has recognized that plaintiffs may bring these types of suits under 42 U.S.C. § 1983 against corporations that are acting under color of state law. *See e.g.*, *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 590–91 (8th Cir. 2004) (citing *Monell* for the proposition that "[a] corporation acting under color of state law will only be held liable under § 1983 for its own unconstitutional policies"); *Edmonds v. Meyer*, 842 F. App'x 13, 14 (8th Cir. 2021) ("where private party acts under color of state law, the test for corporate liability is whether an official policy, custom, or action inflicts injury actionable under § 1983").

been sued on a *Monell* claim, "individual liability first must be found on an underlying substantive claim." *Moore v. City of Desloge, Mo.*, 647 F.3d 841, 849 (8th Cir. 2011) (quoting *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005)); *accord Mahn v. Jefferson Cnty., Missouri*, 891 F.3d 1093, 1099–100 (8th Cir. 2018); *Johnson v. City of Ferguson, Missouri*, 926 F.3d 504, 506 (8th Cir. 2019) (en banc); *Walz v. Randall*, 2 F.4th 1091, 1105 n.6 (8th Cir. 2021). In *Moore*, for example, the Eighth Circuit explained that because the plaintiff failed to establish that a police officer violated his constitutional rights, he could not maintain this action against either the police chief or the city. *Moore*, 647 F.3d at 849. Likewise, in *McCoy*, the Eighth Circuit reasoned that because a police officer's actions were objectively reasonable and did not constitute a Fourth Amendment violation, "the City [could not] be held liable on either an unconstitutional policy or custom theory or on a failure to train or supervise theory" precisely because municipal liability can only attach where individual liability is first found on an underlying substantive claim. *McCoy*, 411 F.3d at 922. Fugett has not sued anyone in their individual capacities, but even if he had, the Court has already concluded that no Eighth and/or Fourteenth Amendment violation occurred in this case for the reasons explained above. Fugett, therefore, cannot go forward on his *Monell* claim without "an underlying substantive claim." *Moore*, 647 F.3d at 849. Thus, like the plaintiffs in *Moore* and *McCoy*, Fugett's *Monell* claim against Wellpath necessarily fails in the absence of an underlying substantive constitutional violation.[23]

---

[23] In reaching this conclusion, the Court is cognizant that "although there must be an unconstitutional act by a municipal employee before a municipality can be held liable, there need not be a finding that a municipal employee is liable in his or her individual capacity." *Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018) (internal quotation marks and citations omitted).

2.   *Fugett's Constitutional Claim Against Douglas County in Count III*

a.   The Parties' Arguments

Much like Wellpath, Douglas County argues "there is no evidence that anyone from [the Douglas County Department of Corrections] intentionally denied or delayed [Fugett's] access to medical care or intentionally interfered with [his] treatment once prescribed so [Fugett] cannot establish anyone from Douglas County was deliberately indifferent." Filing 84 at 19. Also like Wellpath, Douglas County argues that it cannot be liable under *Monell* without an underlying constitutional violation. Filing 84 at 23. It further contends that it does "not have an official policy or unconstitutional custom of denying medical care." Filing 84 at 24.

Fugett counters that Douglas County "set the standards of medical care in its contract with Wellpath" and that by not adopting a system of "opt out" testing for inmates, Douglas County was deliberately indifferent to Fugett's medical needs "and those of the community at large." Filing 90 at 8. Fugett further argues that Douglas County was well aware of the prevalence of STDs within the local community and still declined to adopt a policy where each inmate would be afforded the opportunity to be tested upon admission to DCC. *See* Filing 90 at 9. Fugett also notes that the contract between Wellpath and Douglas County explicitly stated that inmates who sought testing for STDs were to be tested. Filing 90 at 10.[24] Therefore, he contends that Douglas County's failure to enforce this provision of the contract constituted deliberate indifference and that "Douglas County knew of other inmates who were wrongfully denied testing after requesting it." Filing 89 at 10.

---

[24] The precise language of the contract said: "Individuals who seek testing shall be tested." Filing 32-2 at 71.

### b.   Applicable Standards

Fugett has not sued any specific officials with Douglas County in their individual capacities. *See generally* Filing 1-1. However, a municipality like Douglas County "can be sued directly under 42 U.S.C. § 1983" on a *Monell* claim. *Rusness v. Becker Cnty., Minnesota*, 31 F.4th 606, 617 (8th Cir. 2022). Under *Monell*, "'[a] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue.'" *Rusness*, 31 F.4th at 617 (emphasis in original) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). It is well established that a municipality cannot be liable under § 1983 under a *respondeat superior theory*, that is, solely because it employs a tortfeasor." *Robbins v. City of Des Moines*, 984 F.3d 673, 681 (8th Cir. 2021) (internal quotation marks omitted). "A municipality may only be liable for a constitutional violation resulting from (1) an official municipal policy; (2) an unofficial custom, or (3) failure to train or supervise." *Id.* at 681–82.

### c.   Discussion

As the Court previously explained when it considered Fugett's constitutional claim against Wellpath, Fugett has failed to provide sufficient evidence necessary to show an Eighth and/or Fourteenth Amendment violation. Because he did not "place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment[,]" *Jackson*, 814 F.3d at 1119, it is not necessary to consider whether anyone associated with Douglas County actually knew about and deliberately disregarded Fugett's medical status. His failure to provide medical evidence showing the detrimental effect of any delay in medical treatment relates to the objective prong of the analysis, not the subjective prong. *See Hancock*, 39 F.4th at 486. Without proof of an objectively serious medical injury, Fugett's constitutional claim fails no matter who he has named as a Defendant.

Additionally, in the absence of an underlying constitutional claim premised upon individual liability, Douglas County cannot be liable on Fugett's *Monell* claim. *See Moore,* 647 F.3d at 849. Although Fugett has asserted that it was the "policy and practice" of both Douglas County and Wellpath "to intentionally fail to diagnose and treat inmates suffering from sexually transmitted infection[s][,]" Filing 1-1 at 17 (¶51), a *Monell* claim still cannot lie against a municipality like Douglas County without an underlying constitutional violation. Therefore, just like Fugett's *Monell* claim against Wellpath, Fugett's *Monell* claim against Douglas County necessarily fails. Summary judgment in Douglas County's favor is, therefore, appropriate.

### III.    CONCLUSION

The Court grants summary judgment in Wellpath's favor on all Counts. The Court grants summary judgment in Douglas County's favor on Count III. The Court dismisses the claims made against Douglas County in Count II of the Complaint for want of subject-matter jurisdiction. Dismissal of Count II against Douglas County will be without prejudice. [25] However, no leave to amend will be granted given that this claim cannot be pleaded in a way that would avoid sovereign immunity. *See U.S. ex rel. Lee v. Fairview Health Sys*., 413 F.3d 748, 449 (8th Cir. 2005) ("Futility is a valid basis for denying leave to amend"). All claims in this case have now been resolved. The Court will enter a separate judgment in accordance with this Order.

---

[25] The Eighth Circuit has repeatedly said "[a] district court is generally barred from dismissing a case with prejudice if it concludes subject matter jurisdiction is absent." *Dalton v. NPC Int'l, Inc.*, 932 F.3d 693, 696 (8th Cir. 2019) (quoting *County of Mille Lacs v. Benjamin*, 361 F.3d 460, 464–65 (8th Cir. 2004)); *see also Hart v. United States*, 630 F.3d 1085, 1091 (8th Cir. 2011) (modifying jurisdictional dismissal to be without prejudice). Other United States Courts of Appeals have said much the same. *See e.g.*, *McKie v. Kornegay*, No. 21-1943, 2022 WL 4241355, at *2 (2d Cir. Sept. 15, 2022) ("A dismissal for lack of subject matter jurisdiction must be without prejudice, because 'without jurisdiction, the district court lacks the power to adjudicate the merits of the case'"); *Brereton v. Bountiful City Corp*., 434 F.3d 1213, 1216 (10th Cir. 2006) ("A longstanding line of cases from this circuit holds that where the district court dismisses an action for lack of jurisdiction, as it did here, the dismissal must be without prejudice").

Accordingly, it is ORDERED:

1.     The Court grants Wellpath's Motion for Summary Judgment, Filing 86, in full;

2.     The Court grants Douglas County's Motion for Summary Judgment, Filing 82, as to Count III of Fugett's Complaint;

3.     The Court dismisses the claims made against Douglas County in Count II of the Complaint for lack of subject-matter jurisdiction without prejudice and without leave to amend; and

4.     The Court will enter a separate judgment in accordance with this Order.

Dated this 15th day of February, 2023.

BY THE COURT:

Brian C. Buescher
United States District Judge